## IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 5, 2012

No. 10-60988

Lyle W. Cayce
Clerk

ENTERGY CORPORATION AND
AFFILIATED SUBSIDIARIES,

Petitioner - Appellee

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellant

Appeal from a Decision of the
United States Tax Court

Before JONES, Chief Judge, and DAVIS and DeMOSS, Circuit Judges.

EDITH H. JONES, Chief Judge:

Appellant Commissioner of Internal Revenue ("Commissioner") seeks review of a United States Tax Court decision favoring Appellee Entergy Corp. ("Entergy") for the taxable years 1997 and 1998. By reference to a companion case, *PPL Corp. v. Comm'r*, 135 T.C. 304 (2010), *rev'd*, 665 F.3d 60 (3d Cir. 2011), the Tax Court concluded Entergy was entitled to a foreign income tax credit for its subsidiary's payment of the United Kingdom's Windfall Tax. The sole question on appeal is whether the Windfall Tax constitutes a creditable foreign income tax under I.R.C. § 901, 26 U.S.C. § 901. Notwithstanding the Third Circuit's contrary opinion, we AFFIRM.

No. 10-60988

## BACKGROUND

The Tax Court and parties treat *PPL Corp.* as materially identical to this case; we do so as well. *See Entergy Corp. v. Comm'r*, 100 T.C.M. (CCH) 202 (2010). The Tax Court and Third Circuit ably detail the history of the Windfall Tax, and we briefly summarize the relevant facts.

Entergy owns London Electricity, one of thirty-two companies, generally utilities, the U.K. privatized through the 1980s and 1990s. The U.K. government set price controls on these utilities but not caps on profits; the newly privatized corporations quickly reduced costs beyond governmental expectations, reaping higher-than-expected profits, share prices, and executive compensation. This in turn led to a public backlash.

In response, the then-opposition Labour Party proposed a new tax on the utilities — a "windfall levy on the excess profits of the privatised utilities." Enlisting the accounting firm Arthur Andersen, the Labour Party designed a series of proposals, including gross receipts taxes and profits taxes, to recoup a desired proportion of the utilities' profits. Geoffrey Robinson, a Labour Member of Parliament, and Gordon Brown, Shadow Chancellor of the Exchequer, ultimately selected the Windfall Tax. Once in power, the Labour Party passed the tax.

The Windfall Tax was designed to address the public's concern that the utilities had been sold too cheaply in light of their profit potential. It imposed on each of the utilities a one-time 23% assessment on the difference between: (1) a company's "profit-making value," defined as its average annual profit per day over an initial period (typically, as here, four years) multiplied by 9, an imputed "price-to-earnings ratio," and (2) its "flotation value," or the price for which it was privatized.

London Electricity timely paid slightly less than £140M as a result of the Windfall Tax, and Entergy filed an amended US. federal tax return in 1998

2

No. 10-60988

claiming an equivalent credit — approximately $234M.   When the IRS disallowed the credit in a notice of deficiency, Entergy contested the notice by filing a petition with the Tax Court.  Entergy and the Commissioner essentially disagreed on whether the Windfall Tax — on "profit-making value," calculated as explained above — constituted a tax on excess profits, creditable under I.R.C. § 901, or a tax on unrealized value for which Entergy could not claim a foreign income tax credit.   Entergy demonstrated that the Windfall Tax could be mathematically re-expressed as a pure tax on profits; the Commissioner pointed to the statute's reference to "profit-making value" as conclusively demonstrating that the tax reached unrealized value rather than excess profits.

The Tax Court relied on its parallel decision in *PPL Corp. v. Comm'r*, 135 T.C. 304 (2010), applying the relevant Treasury regulation interpreting Section 901, 26 C.F.R. § 1.901-2(a).  *Entergy*, 100 T.C.M. (CCH) 202.  The Tax Court determined the Windfall Tax was based on excess profits, and that it therefore necessarily satisfied § 1.901-2(a)'s three-part "predominant character" test: namely, that the Windfall Tax (1) reached only realized income, (2) was imposed on the basis of gross receipts, and (3) targeted only net income.  *PPL*, 135 T.C. at 337-39.  The Tax Court therefore ruled Entergy entitled to a tax credit.  *Entergy*, 100 T.C.M. 202.  The Commissioner appealed in both *PPL* and this case.

## STANDARD OF REVIEW

This court applies the same standard of review to decisions of the Tax Court as we do to district court decisions: findings of fact are reviewed for clear error and issues of law are reviewed de novo.  *Terrell v. Comm'r*, 625 F.3d 254, 258 (5th Cir. 2010).

## DISCUSSION

The parties agree that 26 C.F.R. § 1.901-2(a) controls.  It provides that "[a] foreign levy is an income tax if and only if[] . . . [t]he predominant character of

3

No. 10-60988

that tax is an income tax in the U.S. sense." 26 C.F.R. §§ 1.901-2(a)(1), (a)(1)(ii). A foreign tax's predominant character "that tax is that of an income tax in the U.S. sense" if it "is likely to reach net gain in the normal circumstances in which it applies." *Id.* at §§ (a)(3), (a)(3)(i). "A foreign tax is likely to reach net gain in the normal circumstances in which it applies if and only if the tax, judged on the basis of its predominant character, satisfies each of the realization, gross receipts, and net income requirements" established by the regulation. *Id.* at § 1.901-2(b)(1).

The realization requirement tracks the American income tax principle that income is typically taxed only following a "realization event," usually "when property is sold or exchanged." BORIS I. BITTKER & LAWRENCE LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES & GIFTS ¶ 72.4.3 (2011). The gross income requirement mandates that "[g]enerally, the starting point for calculating income subject to a creditable foreign income tax must be actual gross receipts." *Id.* And the net income requirement only allows accreditation for taxes which "provid[e] for 'recovery of the significant costs and expenses (including significant capital expenditures) attributable, under reasonable principles, to [the] gross receipts included in the tax base.'" *Id.*

The Tax Court considered two competing interpretations of the Windfall Tax's reliance on "profit-making value." The Commissioner offered a "text-bound approach to determining" creditability, relying primarily on the fact that the Windfall Tax by its own terms levied the difference between two statutory values. *PPL Corp.*, 135 T.C. at 332, 334. The Commissioner further argued this ineluctable conclusion flowed directly from the Tax Court's obligation to examine the text of the Windfall Tax *alone*, to the exclusion of historical and mathematical sources. *Id.* at 333. PPL, by contrast, argued that both parliamentary history surrounding the Windfall Tax as well as algebraic reformulations demonstrated that the Windfall Tax was both intended as and

No. 10-60988

actually acted as an excess profits tax. *Id.* at 326-27.

The Tax Court agreed with the latter view, refusing the Commissioner's argument that "the words of the . . . statute *are* the 'substance'" of the tax and affirming the propriety of resorting to extra-statutory sources under the predominant character standard. *Id.* at 331, 334-35. The Tax Court concluded that the Windfall Tax acted as an excess profits tax despite its imposition on "profit-making value," specifically noting that:

> The architects and drafters of the tax knew (1) exactly which companies the tax would target, (2) the publicly reported after-tax financial profits of those companies, which were a crucial component of the tax base, AND (3) [the ta]rget amount of revenue the tax would raise. [T]herefore, it cannot have been an unintentional or fortuitous result that, (1) for 29 of the 31 windfall tax companies that paid tax, the effective rate of tax on deemed annual excess profits was at or near 51.7 percent, and (2) for none of the 31 companies did the tax exceed initial total period gains. What respondent refers to as "petitioner's algebraic reformulations of the Windfall Tax statute" do not, as respondent argues, constitute an impermissible "hypothetical rewrite of the Windfall Tax statute[.]"[] Rather, they represent a legitimate means of demonstrating that Parliament did, in fact, enact a tax that operated as an excess profits tax for the vast majority of the windfall tax companies. The design of the windfall tax formula made certain that the tax would, in fact, operate as an excess profits tax for the vast majority of companies subject to it.

*Id.* at 339-341. The Tax Court concluded the Windfall Tax, a tax on excess profits, satisfied each of the net gain test's three requirements, and that it was therefore a creditable foreign income tax.

The Commissioner reiterates his insistence on the primacy of the Windfall Tax's text, which uses the term "profit-making value" to describe the base for calculation of the tax. This argument is easy to dispatch. The case law from which 26 C.F.R. § 1.901-2 is derived refutes the Commissioner's assertion that we should rely exclusively, or even chiefly, on the text of the Windfall Tax in

5

No. 10-60988

determining the tax's "predominant character." "The label and form of [a] foreign tax is not determinative." *Inland Steel Co. v. U.S.*, 677 F.2d 72, 80 (Ct. Cl. 1982). "We do not . . . consider it alldecisive [sic] whether the foreign income tax is labeled a gross income or a net income tax . . . . The important thing is whether the other country is attempting to reach some net gain, *not the form in which it shapes the income tax or the name it gives*." *Bank of Am. Nat. Trust & Sav. Ass'n v. U.S.*, 459 F.2d 513, 519 (Ct. Cl. 1972) (emphasis added).

Viewed in practical terms, the Windfall Tax clearly satisfies the realization and net income requirements. The Windfall Tax is based on revenues from the ordinary operation of the utilities that accrued long before the design and implementation of the tax. Revenues from earlier ordinary operation are clearly "realized;" indeed, the Labour Party accurately estimated the amount the Windfall Tax would raise, as the earnings of each of the utilities were publicly available when the Labour Party drafted the tax. Furthermore, the tax *only* reached — and only *could* reach — utilities that realized a profit in the relevant period, calculating profit in the ordinary sense (*e.g.* by subtracting operating expenses associated with generating the utilities' income). This satisfies the net income requirement.

The Commissioner's formalistic argument applies with somewhat greater force to the gross receipts requirement. A tax actually directed at corporate value would not, in the ordinary instance, be imposed on the basis of gross receipts. The Commissioner essentially urges that because Parliament computed the Windfall Tax based on "profit-making value," calculated according to average profits over an initial period, the tax is not designed to reach gross receipts, even though the tax may be based on gross receipts in some indirect way. But we are persuaded by the Tax Court's astute observations as to the Windfall Tax's predominant character: the tax's history and practical operation were to "claw back" a substantial portion of privatized utilities' "excess profits"

6

No.  10-60988

in light of their sale value.  These initial profits were the difference between the utilities' income from all sources less their business expenses — in other words, gross receipts less expenses from those receipts, or net income.  The tax rose in direct proportion to additional profits above a fixed (and carefully calculated) floor.  That Parliament termed this aggregated but entirely profit-driven figure a "profit-making value" must not obscure the history and actual effect of the tax, that is, its predominant character.

Following oral argument in this case, however, the Third Circuit concluded to the contrary:  that the Windfall Tax fails at least the gross receipts requirement of the governing regulation, 26 C.F.R. § 1.901-2(a), and is therefore not a creditable foreign income tax.  *PPL Corp. v. Comm'r*, 665 F.3d 60, 65-66 (3d Cir. 2011).  It regarded the Appellee taxpayer's mathematical reformulation, demonstrating the Windfall Tax equated to a 51.75% tax on initial period profits, as a "bridge too far," requiring that court to "rewrite the tax rate" to find the Windfall Tax creditable.  *PPL*, 665 F.3d at 65.  The Third Circuit accepted that perhaps the Windfall Tax reached 23% of 2.25 times the companies' initial period profits, but it viewed this as fatal to the gross receipts requirement.  *Id.*  Since a tax must be established on the basis of no more than 100% of gross receipts, the Third Circuit reasoned, a tax imposed on 23% of 225% of profits could not satisfy the regulatory requirement.  *Id.* at 67.  The Third Circuit viewed Example 3 of 26 C.F.R. § 1.901-2(b)(3)(ii), disallowing a theoretical credit for a tax based on 105% the value of extracted petroleum, as bolstering its conclusion: "[i]f 105% of gross receipts (barely more than actual receipts) does not satisfy the requirement, then 225% is in the same boat but another ocean."  *Id.*  That court reversed the Tax Court's judgment.  *Id.* at 68.

This reasoning exemplifies the form-over-substance methodology that the governing regulation and case law eschew.  The gross receipts requirement ensures a creditable income tax is usually computed "begin[ning] from actual

7

No. 10-60988

gross receipts, rather than notional amounts." BITTKER & LOKKEN at ¶ 72.1. This distinction between "actual receipts" and "notional amounts" reflects a core requirement in Section 1.901-2 that creditable foreign taxes must be based on either actual income *or* an imputed value *not* intended to reach *more* than actual gross receipts.

This policy arises from a common foreign response to the attempt to avoid double taxation. Foreign countries would use imputed, rather than actual, income formulas for income tax purposes "structured to tax artificial or fictitious income" in order to increase domestic tax receipts. The taxed corporation, entitled to a dollar-for-dollar foreign tax credit, acted as a conduit from the tax-accrediting nation (*e.g.* the U.S.) to the nation imposing the tax on fictitious imputed income instead of actual income. *See, e.g.*, *Foreign Tax Credit; Libya & Saudi Arabia*, 1978-1 C.B. 228. The gross receipts requirement therefore serves as one mechanism to prevent foreign nations from "soaking up" American tax revenue by levying an income tax on an imputed amount deliberately calculated to reach some amount greater than the business's actual gross receipts.

Nevertheless, not all methods of imputing income fail to satisfy the gross receipts requirement. Section 1.901-2(b)(3)(i) indicates that a foreign tax satisfies the gross receipts requirement if it is imposed either on *actual* gross receipts or *imputed* gross receipts "computed under a method that is likely to produce an amount that is not greater than fair market value." Either of these reflects "actual gross receipts." Treas. Reg. § 1.901-2(b)(3)(i)(A), (B). A fictitious calculation likely to produce an amount greater than the fair market value of *actual* gross receipts is instead a forbidden fictitious "notional amount."

A close reading of *all* of the examples following the subsection establishing the gross receipts requirement indicates they do not illustrate the meaning of "actual gross receipts," but instead differentiate between permissible *imputed*

No. 10-60988

actual gross receipts and impermissible notional amounts. Example 1 considers a "headquarters company tax" where "arm's length gross receipts" for a hypothetical foreign regional headquarters of a nonresident company would be difficult to actually calculate, and are thus deemed 110% of the business expenses of the foreign branch. *Id.* at § 1.901-2(b)(3)(ii) Ex. 1. Because this formula is designed to produce an amount that is likely not greater than the fair market value of arm's-length gross receipts from such transactions with affiliates, the example concludes that the headquarters company tax satisfies the gross receipts requirement. Example 2 posits a specific circumstance in which the headquarters tax actually produces an amount much greater than actual gross receipts' value. Because a tax either is or is not creditable for all entities subject to the tax, however, it remains creditable under either Example 1 or 2. Example 3 hypothesizes a tax on the extraction of petroleum where the income value of the petroleum is deemed to be 105% of the fair market value of the petroleum: *i.e.* deliberately greater than actual gross receipts. The petroleum extraction tax is obviously a method for computing an impermissible notional amount greater than actual gross receipts. Because this imputation is fictionally exaggerated, inflating the amount subject to foreign taxation, it is not creditable.

The Windfall Tax relies on no Example 3-type imputed amount, nor indeed on any imputation, for calculating gross receipts. Instead, the Windfall Tax begins by taking 23% of the daily average of profit based on *actual gross receipts*, multiplied by a statutory constant of nine (deemed a "price-to-earnings ratio"), less each company's flotation value. No more and no less. The Windfall Tax at no point imputes gross receipts against the utilities as difficult to calculate or impractical to know; in fact, by all accounts, the Labour Party forecasted the estimated revenue from the Windfall Tax with extreme accuracy, because the various utilities' earnings information was long since public before the Windfall Tax was even proposed. There was no need to calculate imputed gross receipts;

9

gross receipts were actually known. And thus, an example detailing an impermissible method for calculating *imputed* gross receipts (based on historical practices by OPEC countries) is facially irrelevant.

In fact, as the record indicates, each utility could only be subject to the Windfall Tax after making a profit exceeding approximately an 11% annual return on its initial flotation value, and the Windfall Tax liability increased linearly with additional profits past that point. Moreover, the Third Circuit opinion seems to overlook that a tax based on actual financial profits in the U.K. sense necessarily begins with gross receipts, as, again, the record here indicates. London Electricity's profit for purpose of the Windfall Tax was calculated by computing gross receipts less operating expenses. The Windfall Tax was designed to reach a *subset* of this leftover amount by beginning with an amount predicated on *actual gross receipts* minus flotation value.

Furthermore, an examination of the origins of the 2.25 multiplier, which the Third Circuit asserts as "proof" that the tax was computed on amounts exceeding gross receipts, illustrates that it had nothing to do with inflating the utilities' profits into notional amounts. *But see PPL Corp. v. Comm'r*, 665 F.3d 60, 65-66 (3d. Cir. 2011). The 2.25 multiplier resulted from dividing the number of days in a year by approximately the number of days in four years — or, simplified, one-quarter. This number was multiplied by nine — the price-to-earnings ratio — to result in 2.25 (times profits). By the Third Circuit's logic, had the Windfall Tax applied to the first *nine* years after flotation, rendering the initial period approximately 3,285 days (and the divisor one-ninth), the "multiplier" would have been (approximately) 1, and the Windfall Tax would suddenly qualify for dollar-for-dollar credit under Internal Revenue Code § 901. But the Third Circuit illogically holds that a Windfall Tax for eight years, or four, as in this case, is in entirely "another ocean" and may not be credited. We are always chary to create a circuit split, *Wheeler v. Pilgrim's Pride Corp.*, 591

No. 10-60988

F.3d 355, 363 (5th Cir. 2009), but we cannot engage in this sort of formalism in light of the predominant character standard. We therefore disagree with the Third Circuit's conclusion and hold that the Windfall Tax is a creditable foreign income tax under I.R.C. § 901.

## CONCLUSION

We conclude that when judged on its predominant character, the Windfall Tax is based on excess profits — realized income derived from gross receipts less deductions for substantial business expenses incurred in earning those receipts. This satisfies the three-part net gain requirement, as the Tax Court accurately noted. We therefore **AFFIRM** the judgment of the Tax Court.

**AFFIRMED.**