(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PPL CORP. ET AL. *v.* COMMISSIONER OF INTERNAL REVENUE

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 12–43.  Argued February 20, 2013—Decided May 20, 2013

In 1997, the United Kingdom (U. K.), newly under Labour Party rule, imposed a one-time "windfall tax" on 32 U. K. companies privatized between 1984 and 1996 by the Conservative government.  The companies had been sold to private parties through an initial sale of shares, known as a "flotation."  Some of the companies were required to continue providing services for a fixed period at the same rates they had offered under government control.  Many of those companies became dramatically more efficient and earned substantial profits in the process.

Petitioner PPL Corporation (PPL), part owner of a privatized U. K. company subject to the windfall tax, claimed a credit for its share of the bill in its 1997 federal income-tax return, relying on Internal Revenue Code §901(b)(1), which states that any "income, war profits, and excess profits taxes" paid overseas are creditable against U. S. income taxes.  Treasury Regulation §1.901–2(a)(1) interprets this section to mean that a foreign tax is creditable if its "predominant character" "is that of an income tax in the U. S. sense."  The Commissioner of Internal Revenue (Commissioner) rejected PPL's claim, but the Tax Court held that the U. K. windfall tax was creditable for U. S. tax purposes under §901.  The Third Circuit reversed.

*Held*: The U. K. tax is creditable under §901.  Pp. 4–14.

(a) Treasury Regulation §1.901–2, which codifies longstanding doctrine dating back to *Biddle* v. *Commissioner*, 302 U. S. 573, 578–579 (1938), provides the relevant legal standard.  First, a tax's "predominant character," or the normal manner in which a tax applies, is controlling.  See *id.*, at 579.  Thus, a foreign tax that operates as an income, war profits, or excess profits tax for most taxpayers is generally

creditable.  Second, foreign tax creditability depends not on the way a foreign government characterizes its tax but on whether the tax, if enacted in the U. S., would be an income, war profits, or excess profits tax.  See §1.901–2(a)(1)(ii).  Giving further form to these principles, §1.901–2(a)(3)(i) explains that a foreign tax's predominant character is that of a U. S. income tax "[i]f . . . the foreign tax is likely to reach net gain in the normal circumstances in which it applies."  Three tests set forth in the regulations provide guidance in making this assessment, see §1.901–2(b)(1).  The tests indicate that net gain consists of realized gross receipts reduced by significant costs and expenses attributable to such gross receipts, in combination known as net income.  A foreign tax that reaches net income, or profits, is creditable.  Pp. 4–7.

(b) The U. K. windfall tax's predominant character is that of an excess profits tax, a category of income tax in the U. S. sense.  The Labour government's conception of "profit-making value" as a backward-looking analysis of historic profits is not a typical valuation method.  Rather, it is a tax on realized net income disguised as a tax on the difference between two values, one of which is a fictitious value calculated using an imputed price-to-earnings ratio.  The substance of the windfall tax confirms this conclusion.  When rearranged, the U. K's formula demonstrates that the windfall tax is economically equivalent to the difference between the profits each company *actually* earned and the amount the Labour government believed it *should* have earned given its flotation value.  For most of the relevant companies, the U. K. formula's substantive effect was to impose a 51.71 percent tax on all profits above a threshold, a classic excess profits tax.  The Commissioner claims that any algebraic rearrangement is improper because U. S. courts must take the foreign tax rate as written and accept whatever tax base the foreign tax purports to adopt.  But such a rigid construction cannot be squared with the black-letter principle that "tax law deals in economic realities, not legal abstractions."  *Commissioner* v. *Southwest Exploration Co.*, 350 U. S. 308, 315.  Given the artificiality of the U. K.'s calculation method, this Court follows substance over form and recognizes that the windfall tax is nothing more than a tax on actual profits above a threshold.  Pp. 7–11.

(c) The Commissioner's additional arguments in support of his position are similarly unpersuasive.  Pp. 11–14.

665 F. 3d 60, reversed.

THOMAS, J., delivered the opinion for a unanimous Court. SOTOMAYOR, J., filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–43

PPL CORPORATION AND SUBSIDIARIES, PETITION-
ERS *v.* COMMISSIONER OF INTERNAL REVENUE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[May 20, 2013]

JUSTICE THOMAS delivered the opinion of the Court.

In 1997, the United Kingdom (U. K.) imposed a one-time "windfall tax" on 32 U. K. companies privatized between 1984 and 1996. This case addresses whether that tax is creditable for U. S. tax purposes. Internal Revenue Code §901(b)(1) states that any "income, war profits, and excess profits taxes" paid overseas are creditable against U. S. income taxes. 26 U. S. C. §901(b)(1). Treasury Regula-tions interpret this section to mean that a foreign tax is creditable if its "predominant character" "is that of an income tax in the U. S. sense." Treas. Reg. §1.901–2(a)(1)(ii), 26 CFR §1.901–2(a)(1) (1992). Consistent with precedent and the Tax Court's analysis below, we apply the predominant character test using a commonsense approach that considers the substantive effect of the tax. Under this approach, we hold that the U. K. tax is credit-able under §901 and reverse the judgment of the Court of Appeals for the Third Circuit.

I

A

During the 1980's and 1990's, the U. K.'s Conservative

Party controlled Parliament and privatized a number of government-owned companies. These companies were sold to private parties through an initial sale of shares, known as a "flotation." As part of privatization, many companies were required to continue providing services at the same rates they had offered under government control for a fixed period, typically their first four years of private operation. As a result, the companies could only increase profits during this period by operating more efficiently. Responding to market incentives, many of the companies became dramatically more efficient and earned substantial profits in the process.

The U. K.'s Labour Party, which had unsuccessfully opposed privatization, used the companies' profitability as a campaign issue against the Conservative Party. In part because of campaign promises to tax what it characterized as undue profits, the Labour Party defeated the Conservative Party at the polls in 1997. Prior to coming to power, Labour Party leaders hired accounting firm Arthur Andersen to structure a tax that would capture excess, or "windfall," profits earned during the initial years in which the companies were prohibited from increasing rates. Parliament eventually adopted the tax, which applied only to the regulated companies that were prohibited from raising their rates. See Finance (No. 2) Act, 1997, ch. 58, pt. I, cls. 1 and 2(5) (Eng.) (U. K. Windfall Tax Act). It imposed a 23 percent tax on any "windfall" earned by such companies. *Id.,* cl. 1(2). A separate schedule "se[t] out how to quantify the windfall from which a company was benefitting." *Id.,* cl. 1(3). See *id.,* sched. 1.

In the proceedings below, the parties stipulated that the following formula summarizes the tax imposed by the Labour Party:

$$\text{Tax} = 23\% \left[ \left( 365 \times \left( \frac{P}{D} \right) \times 9 \right) - \text{FV} \right]$$

D equals the number of days a company was subject to

rate regulation (also known as the "initial period"), P equals the total profits earned during the initial period, and FV equals the flotation value, or market capitalization value after sale. For 27 of the 32 companies subject to the tax, the number of days in the initial period was 1,461 days (or four years). Of the remaining five companies, one had no tax liability because it did not earn any windfall profits. Three had initial periods close to four years (1,463, 1,456, and 1,380 days). The last was privatized shortly before the Labour Party took power and had an initial period of only 316 days.

The number 9 in the formula was characterized as a price-to-earnings ratio and was selected because it represented the lowest average price-to-earnings ratio of the 32 companies subject to the tax during the relevant period.[1] See *id.*, sched. 1, §1, cl. 2(3); Brief for Respondent 7. The statute expressly set its value, and that value was the same for all companies. U. K. Windfall Tax Act, sched. 1, §1, cl. 2(3). The only variables that changed in the windfall tax formula for all the companies were profits (P) and flotation value (FV); the initial period (D) varied for only a few of the companies subject to the tax. The Labour government asserted that the term $[365 \times (P/D) \times 9]$ represented what the flotation value *should have been* given the assumed price-to-earnings ratio of 9. Thus, it claimed (and the Commissioner here reiterates) that the tax was simply a 23 percent tax on the difference between what the companies' flotation values *should have been* and what they actually were.

B

Petitioner PPL Corporation (PPL) was an owner,

---

[1] A price-to-earnings ratio "is defined as the stock price divided by annual earnings per share. It is typically calculated by dividing the current stock price by the sum of the previous four quarters of earnings." 3 New Palgrave Dictionary of Money & Finance 176 (1992).

through a number of subsidiaries, of 25 percent of South
Western Electricity plc, 1 of 12 government-owned elec-
tric companies that were privatized in 1990 and that were
subject to the tax. See 135 T. C. 304, 307, App. (2010)
(diagram of PPL corporate structure in 1997). South
Western Electricity's total U. K. windfall tax burden was
£90,419,265. In its 1997 federal income-tax return, PPL
claimed a credit under §901 for its share of the bill. The
Commissioner of Internal Revenue (Commissioner) rejected
the claim, but the Tax Court held that the U. K. wind-
fall tax was creditable for U. S. tax purposes under §901.
See *id.*, at 342. The Third Circuit reversed. 665 F. 3d 60,
68 (2011). We granted certiorari, 568 U. S. ___ (2012), to
resolve a Circuit split concerning the windfall tax's cred-
itability under §901. Compare 665 F. 3d, at 68, with
*Entergy Corp. & Affiliated Subsidiaries* v. *Commissioner*,
683 F. 3d 233, 239 (CA5 2012).

## II

Internal Revenue Code §901(b)(1) provides that "[i]n the
case of . . . a domestic corporation, the amount of any
income, war profits, and excess profits taxes paid or ac-
crued during the taxable year to any foreign country or to
any possession of the United States" shall be creditable.[2]
Under relevant Treasury Regulations, "[a] foreign levy is
an income tax if and only if . . . [t]he predominant charac-
ter of that tax is that of an income tax in the U. S. sense."
26 CFR §1.901–2(a)(1). The parties agree that Treasury
Regulation §1.901–2 applies to this case. That regulation
codifies longstanding doctrine dating back to *Biddle* v.

_____

[2] Prior to enactment of what is now §901, income earned overseas was
subject to taxes not only in the foreign country but also in the United
States. See *Burnet* v. *Chicago Portrait Co.*, 285 U. S. 1, 7 (1932). The
relevant text making "income, war-profits and excess-profits taxes"
creditable has not changed since 1918. See Revenue Act of 1918,
§§222(a)(1), 238(a), 40 Stat. 1073, 1080.

*Commissioner*, 302 U. S. 573, 578–579 (1938), and provides the relevant legal standard.

The regulation establishes several principles relevant to our inquiry. First, the "predominant character" of a tax, or the normal manner in which a tax applies, is controlling. See *id.*, at 579 ("We are here concerned only with the 'standard' or normal tax"). Under this principle, a foreign tax that operates as an income, war profits, or excess profits tax in most instances is creditable, even if it may affect a handful of taxpayers differently. Creditability is an all or nothing proposition. As the Treasury Regulations confirm, "a tax either is or is not an income tax, in its entirety, for all persons subject to the tax." 26 CFR §1.901–2(a)(1).

Second, the way a foreign government characterizes its tax is not dispositive with respect to the U. S. creditability analysis. See §1.901–2(a)(1)(ii) (foreign tax creditable if predominantly "an income tax in the U. S. sense"). In *Biddle*, the Court considered the creditability of certain U. K. taxes on stock dividends under the substantively identical predecessor to §901. The Court recognized that "there is nothing in [the statute's] language to suggest that in allowing the credit for foreign tax payments, a shifting standard was adopted by reference to foreign characterizations and classifications of tax legislation." 302 U. S., at 578–579. See also *United States* v. *Goodyear Tire & Rubber Co.*, 493 U. S. 132, 145 (1989) (noting in interpreting 26 U. S. C. §902 that *Biddle* is particularly applicable "where a contrary interpretation would leave" tax interpretation "to the varying tax policies of foreign tax authorities"); *Heiner* v. *Mellon*, 304 U. S. 271, 279, and n. 7 (1938) (state-law definitions generally not controlling in federal tax context). Instead of the foreign government's characterization of the tax, the crucial inquiry is the tax's economic effect. See *Biddle, supra*, at 579 (inquiry is "whether [a tax] is the substantial equivalent of

payment of the tax as those terms are used in our own statute"). In other words, foreign tax creditability depends on whether the tax, if enacted in the U. S., would be an income, war profits, or excess profits tax.

Giving further form to these principles, Treasury Regulation §1.901–2(a)(3)(i) explains that a foreign tax's predominant character is that of a U. S. income tax "[i]f . . . the foreign tax is likely to reach net gain in the normal circumstances in which it applies." The regulation then sets forth three tests for assessing whether a foreign tax reaches net gain. A tax does so if, "judged on the basis of its predominant character, [it] satisfies each of the realization, gross receipts, and net income requirements set forth in paragraphs (b)(2), (b)(3) and (b)(4), respectively, of this section." §1.901–2(b)(1).[3] The tests indicate that net gain (also referred to as net income) consists of realized gross receipts reduced by significant costs and expenses attributable to such gross receipts. A foreign tax that reaches

_____

[3] The relevant provisions provide as follows:

"A foreign tax satisfies the realization requirement if, judged on the basis of its predominant character, it is imposed—(A) Upon or subsequent to the occurrence of events ('realization events') that would result in the realization of income under the income tax provisions of the Internal Revenue Code." 26 CFR §1.901–2(b)(2)(i).

"A foreign tax satisfies the gross receipts requirement if, judged on the basis of its predominant character, it is imposed on the basis of—(A) Gross receipts; or (B) Gross receipts computed under a method that is likely to produce an amount that is not greater than fair market value." §1.901–2(b)(3)(i).

"A foreign tax satisfies the net income requirement if, judged on the basis of its predominant character, the base of the tax is computed by reducing gross receipts . . . to permit—(A) Recovery of the significant costs and expenses (including significant capital expenditures) attributable, under reasonable principles, to such gross receipts; or (B) Recovery of such significant costs and expenses computed under a method that is likely to produce an amount that approximates, or is greater than, recovery of such significant costs and expenses." §1.901–2(b)(4)(i).

net income, or profits, is creditable.

### III

### A

It is undisputed that net income is a component of the U. K.'s "windfall tax" formula. See Brief for Respondent 23 ("The windfall tax takes into account a company's profits during its four-year initial period"). Indeed, annual profit is a variable in the tax formula. U. K. Windfall Tax Act, sched. 1, §1, cls. 2(2) and 5. It is also undisputed that there is no meaningful difference for our purposes in the accounting principles by which the U. K. and the U. S. calculate profits. See Brief for Petitioners 47. The disagreement instead centers on how to characterize the tax formula the Labour Party adopted.

The Third Circuit, following the Commissioner's lead, believed it could look no further than the tax formula that the Parliament enacted and the way in which the Labour government characterized it. Under that view, the windfall tax must be considered a tax on the difference between a company's flotation value (the total amount investors paid for the company when the government sold it) and an imputed "profit-making value," defined as a company's "average annual profit during its 'initial period' . . . times 9, the assumed price-to-earnings ratio." 665 F. 3d, at 65. So characterized, the tax captures a portion of the difference between the price at which each company was sold and the price at which the Labour government believed each company *should have been* sold given the actual profits earned during the initial period. Relying on this characterization, the Third Circuit believed the windfall tax failed at least the Treasury Regulation's realization and gross receipts tests because it reached some artificial form of valuation instead of profits. See *id.*, at 67, and n. 3.

In contrast, PPL's position is that the substance of the

windfall tax is that of an income tax in the U. S. sense. While recognizing that the tax ostensibly is based on the difference between two values, it argues that every "variable" in the windfall tax formula except for profits and flotation value is fixed (at least with regard to 27 of the 32 companies). PPL emphasizes that the only way the Labour government was able to calculate the imputed "profit-making value" at which it claimed companies should have been privatized was by looking after the fact at the *actual profits* earned by each company. In PPL's view, it matters not how the U. K. chose to arrange the formula or what it *claimed* to be taxing, because a tax based on profits above some threshold is an excess profits tax, regardless of how it is mathematically arranged or what labels foreign law places on it. PPL, thus, contends that the windfall taxes it paid meet the Treasury Regulation's tests and are creditable under §901.

We agree with PPL and conclude that the predominant character of the windfall tax is that of an excess profits tax, a category of income tax in the U. S. sense. It is important to note that the Labour government's conception of "profit-making value" as a backward-looking analysis of historic profits is not a recognized valuation method; instead, it is a fictitious value calculated using an imputed price-to-earnings ratio. At trial, one of PPL's expert witnesses explained that "'9 is not an accurate P/E multiple, and it is not applied to current or expected future earnings.'" 135 T. C., at 326, n. 17 (quoting testimony). Instead, the windfall tax is a tax on realized net income disguised as a tax on the difference between two values, one of which is completely fictitious. See App. 251, Report ¶1.7 ("[T]he *value in profit making terms* described in the wording of the act . . . is not a real value: it is rather a construct based on realised profits that would not have been known at the date of privatisation").

The substance of the windfall tax confirms the accuracy

of this observation.  As already noted, the parties stipulated that the windfall tax could be calculated as follows:

$$\text{Tax} = 23\% \left[\left(365 \times \left(\frac{P}{D}\right) \times 9\right) - FV\right]$$

This formula can be rearranged algebraically to the following formula, which is mathematically and substantively identical:[4]

$$\text{Tax} = \left[\frac{(365 \times 9 \times 23\%)}{D}\right] \times \left\{P - \left[FV \times \frac{D}{(365 \times 9)}\right]\right\}$$

The next step is to substitute the actual number of days for D.  For 27 of the 32 companies subject to the windfall tax, the number of days was identical, 1,461 (or four years).  Inserting that amount for D in the formula yields the following:

$$\text{Tax} = \left[\frac{(365 \times 9 \times 23\%)}{1{,}461}\right] \times \left\{P - \left[FV \times \frac{1{,}461}{(365 \times 9)}\right]\right\}$$

Simplifying the formula by multiplying and dividing numbers reduces the formula to:

$$\text{Tax} = 51.71\% \times \left[P - \left(\frac{FV}{9}\right) \times 4.0027\right]$$

As noted, FV represents the value at which each company was privatized.  FV is then divided by 9, the arbitrary "price-to-earnings ratio" applied to every company.  The

_____

[4]The rearrangement requires only basic algebraic manipulation. First, because order of operations does not matter for multiplication and division, the formula is rearranged to the following:

$$\text{Tax} = 23\% \left[\left(365 \times 9 \times \left(\frac{P}{D}\right)\right) - FV\right]$$

Next, everything outside the brackets is multiplied by $\left[\frac{(365 \times 9)}{D}\right]$, and everything inside the brackets is multiplied by the inverse, $\left[\frac{D}{(365 \times 9)}\right]$. The effect is the same as multiplication by the number one (since $\left\{\left[\frac{(365 \times 9)}{D}\right] \times \left[\frac{D}{(365 \times 9)}\right]\right\} = 1$).  That multiplication yields the formula in the text.

economic effect is to convert flotation value into the profits a company *should* have earned given the assumed price-to-earnings ratio. See 135 T. C., at 327 ("'In effect, the way the tax works is to say that the amount of profits you're allowed in any year before you're subject to tax is equal to one-ninth of the flotation price. After that, profits are deemed excess, and there is a tax'" (quoting testimony from the treasurer of South Western Electricity plc)). The annual profits are then multiplied by 4.0027, giving the total "acceptable" profits (as opposed to windfall profit) that each company's flotation value entitled it to earn during the initial period given the artificial price-to-earnings ratio of 9. This fictitious amount is finally subtracted from *actual* profits, yielding the excess profits, which were taxed at an effective rate of 51.71 percent.

The rearranged tax formula demonstrates that the windfall tax is economically equivalent to the difference between the profits each company *actually* earned and the amount the Labour government believed it *should* have earned given its flotation value. For the 27 companies that had 1,461-day initial periods, the U. K. tax formula's substantive effect was to impose a 51.71 percent tax on all profits earned above a threshold. That is a classic excess profits tax. See, *e.g.*, Act of Mar. 3, 1917, ch. 159, Tit. II, §201, 39 Stat. 1000 (8 percent tax imposed on excess profits exceeding the sum of $5,000 plus 8 percent of invested capital).

Of course, other algebraic reformulations of the windfall tax equation are possible. See 665 F. 3d, at 66; Brief for Anne Alstott et al. as *Amici Curiae* 21–23 (Alstott Brief). The point of the reformulation is not that it yields a particular percentage (51.75 percent for most of the companies). Rather, the algebraic reformulations illustrate the economic substance of the tax and its interrelationship with net income.

The Commissioner argues that any algebraic rear-

rangement is improper, asserting that U. S. courts must take the foreign tax rate as written and accept whatever tax base the foreign tax purports to adopt. Brief for Respondent 28. As a result, the Commissioner claims that the analysis begins and ends with the Labour government's choice to characterize its tax base as the difference between "profit-making value" and flotation value. Such a rigid construction is unwarranted. It cannot be squared with the black-letter principle that "tax law deals in economic realities, not legal abstractions." *Commissioner* v. *Southwest Exploration Co.*, 350 U. S. 308, 315 (1956). Given the artificiality of the U. K.'s method of calculating purported "value," we follow substance over form and recognize that the windfall tax is nothing more than a tax on actual profits above a threshold.

### B

We find the Commissioner's other arguments unpersuasive as well. First, the Commissioner attempts to buttress the argument that the windfall tax is a tax on value by noting that some U. S. gift and estate taxes use actual, past profits to estimate value. Brief for Respondent 17–18 (citing 26 CFR §20.2031–3 (2012) and 26 U. S. C. §2032A). This argument misses the point. In the case of valuation for gift and estate taxes, past income may be used to estimate future income streams. But, it is *future* revenue-earning potential, reduced to market value, that is subject to taxation. The windfall profits tax, by contrast, undisputedly taxed *past*, realized net income alone.

The Commissioner contends that the U. K. was not trying to establish valuation as of the 1997 date on which the windfall tax was enacted but instead was attempting to derive a proper flotation valuation as of each company's flotation date. Brief for Respondent 21. The Commissioner asserts that there was no need to estimate future income (as in the case of the gift or estate recipient) because

actual revenue numbers for the privatized companies were available. *Ibid.* That argument also misses the mark. It is true, of course, that the companies might have been privatized at higher flotation values had the government recognized how efficient—and thus how profitable—the companies would become. But, the windfall tax requires an underlying concept of value (based on actual *ex post* earnings) that would be alien to any valuer. Taxing actual, realized net income in hindsight is not the same as considering past income for purposes of estimating future earning potential.

The Commissioner's reliance on Example 3 to the Treasury Regulation's gross receipts test is also misplaced. *Id.*, at 37–38; 26 CFR §1.901–2(b)(3)(ii), Ex. 3. That example posits a petroleum tax in which "gross receipts from extraction income are deemed to equal 105 percent of the fair market value of petroleum extracted. This computation is designed to produce an amount that is greater than the fair market value of actual gross receipts." *Ibid.* Under the example, a tax based on inflated gross receipts is not creditable.

The Third Circuit believed that the same type of algebraic rearrangement used above could also be used to rearrange a tax imposed on Example 3. It hypothesized:

"Say that the tax rate on the hypothetical extraction tax is 20%. It is true that a 20% tax on 105% of receipts is mathematically equivalent to a 21% tax on 100% of receipts, the latter of which would satisfy the gross receipts requirement. PPL proposes that we make the same move here, increasing the tax rate from 23% to 51.75% so that there is no multiple of receipts in the tax base. But if the regulation allowed us to do that, the example would be a nullity. *Any* tax on a multiple of receipts or profits could satisfy the gross receipts requirement, because we could reduce

the starting point of its tax base to 100% of gross receipts by imagining a higher tax rate." 665 F. 3d, at 67.

The Commissioner reiterates the Third Circuit's argument. Brief for Respondent 37–38.

There are three basic problems with this approach. As the Fifth Circuit correctly recognized, there is a difference between imputed and actual receipts. "Example 3 hypothesizes a tax on the extraction of petroleum where the income value of the petroleum is deemed to be . . . deliberately greater than actual gross receipts." *Entergy Corp.*, 683 F. 3d, at 238. In contrast, the windfall tax depends on *actual* figures. *Ibid.* ("There was no need to calculate imputed gross receipts; gross receipts were actually known"). Example 3 simply addresses a different foreign taxation issue.

The argument also incorrectly equates imputed *gross receipts* under Example 3 with *net income.* See 665 F. 3d, at 67 ("*[a]ny* tax on a multiple of receipts or profits"). As noted, a tax is creditable only if it applies to realized gross receipts *reduced by significant costs and expenses attributable to such gross receipts.* 26 CFR §1.901–2(b)(4)(i). A tax based solely on gross receipts (like the Third Circuit's analysis) would be noncreditable because it would fail the Treasury Regulation's *net income* requirement.

Finally, even if expenses were subtracted from imputed gross receipts before a tax was imposed, the effect of inflating only gross receipts would be to inflate revenue while holding expenses (the other component of net income) constant. A tax imposed on inflated income minus actual expenses is not the same as a tax on net income.[5]

———————

[5]Mathematically, the Third Circuit's hypothetical was incomplete. It should have been:

$$20\% \ [\ 105\% \ (\text{Gross Receipts}) - \text{Expenses}\ ] = \text{Tax}$$

But 105% of gross receipts minus expenses is *not* net income. Thus, the

For these reasons, a tax based on imputed gross receipts is not creditable. But, as the Fifth Circuit explained in rejecting the Third Circuit's analysis, Example 3 is "facially irrelevant" to the analysis of the U. K. windfall tax, which is based on true net income. *Entergy Corp., supra*, at 238.[6]

\* \* \*

The economic substance of the U. K. windfall tax is that of a U. S. income tax. The tax is based on net income, and the fact that the Labour government chose to characterize it as a tax on the difference between two values is not dispositive under Treasury Regulation §1.901–2. Therefore, the tax is creditable under §901.

The judgment of the Third Circuit is reversed.

*It is so ordered.*

---

20% tax is not a tax on net income and is not creditable.

[6] An *amici* brief argues that because two companies had initial periods substantially shorter than four years, the predominant character of the U. K. windfall tax was not a tax on income in the U. S. sense. See Alstott Brief 29 (discussing Railtrack Group plc and British Energy plc). The argument amounts to a claim that two outliers changed the predominant character of the U. K. tax. See 135 T. C. 304, 340, n. 33 (2010) (rejecting this view).

The Commissioner admitted at oral argument that it did not preserve this argument, a fact reflected in its briefing before this Court and in the Third Circuit. See Tr. of Oral Arg. 35–36; Opening Brief for Appellant and Reply Brief for Appellant in No. 11–1069 (CA3). We therefore express no view on its merits.

# SUPREME COURT OF THE UNITED STATES

———

No. 12–43

———

## PPL CORPORATION AND SUBSIDIARIES, PETITION-ERS *v.* COMMISSIONER OF INTERNAL REVENUE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[May 20, 2013]

JUSTICE SOTOMAYOR, concurring.

The Court's conclusion that the windfall tax is a creditable excess profits tax under 26 U. S. C. §901(b)(1) depends on two interrelated analytic moves: first, restricting the "predominant character" analysis to those companies that shared an "initial period" of rate regulation of 1,461 days; and second, treating the tax's initial period variable as fixed. See *ante,* at 9–10. But there is a different way of looking at this case. If the predominant character inquiry is expanded to include the five companies that had different initial periods, especially those with much shorter initial periods, it becomes impossible to rewrite the windfall tax as an excess profits tax. Instead, it becomes clear that the windfall tax is functionally a tax on value. But because the Government took the position at oral argument that the predominant character inquiry should disregard such "outlie[r]" companies, see Tr. of Oral Arg. 38–39, and this argument is therefore only pressed by *amici*, Brief for Anne Alstott et al. as *Amici Curiae* 28–30 (hereinafter Alstott Brief), I reserve consideration of this argument for another day and another context and join the Court's opinion.

\*   \*   \*

The Internal Revenue Code provides that "income, war

profits, and excess profits taxes" paid to a foreign country are creditable. 26 U. S. C. §901(b)(1). Whether a foreign tax falls within one of these categories depends on whether its "predominant character . . . is that of an income tax in the U. S. sense." 26 CFR §1.901–2(a)(1)(ii) (2010). As the Court explains, there are three components to this inquiry, *ante,* at 4–7, but at its core the inquiry simply asks whether a foreign tax resembles a typical income, war profits, or excess profits tax, *ante,* at 6.

Importantly, though, the relevant Treasury Regulations also provide that a foreign tax "is or is not an income tax, in its entirety, for all persons subject to the tax." 26 CFR §1.901–2(a)(1). One way to understand this language is that for a tax to be classed as a creditable income tax, its predominant character must be that of an income tax with respect to "all persons subject to the tax." Of course, among the many persons subject to a tax, some may face tax burdens different from the majority of affected taxpayers. The challenge in applying predominant character analysis will sometimes lie in determining whether and how such outlier taxpayers affect the characterization of a given tax.[1]

---

[1] For example, some taxes may produce outliers that might suggest that the tax is not an income tax, when in fact the tax is attempting to reach net gain and therefore has the predominant character of an income tax. This situation often arises when a tax relies on imperfect estimates and assumptions in attempting to calculate net gain. Such a tax strives to treat similarly situated taxpayers the same but fails to do so only because the estimated component inadvertently affects some taxpayers differently. A situation of this kind occurred in *Texasgulf, Inc.* v. *Commissioner*, 172 F. 3d 209 (CA2 1999). In that case, a Canadian mining tax did not permit taxpayers to deduct their specific expenses, but did permit them to deduct a fixed "processing allowance." *Id.,* at 211–213. The taxpayer argued that the tax was creditable because the processing allowance was an attempt to reach net income, gross income minus expenses, by using "'a method that is likely to produce an amount that approximates, or is greater than, recovery of such significant costs and expenditures.'" *Id.,* at 215 (quoting 26 CFR

The windfall tax at issue here exemplifies this problem. As the Court notes, *ante,* at 2–3, the parties stipulated to the following form of the windfall tax:

$$Tax = 23\% \times \left[\left(365 \times \frac{P}{D} \times 9\right) - FV\right]$$

If the predominant character analysis is restricted to those 27 companies that share an identical initial period length, then it makes sense to fix D at 1,461, as the Court does. *Ante,* at 9–10. And from there, it is just a matter of basic algebra, *ante,* at 9, and n. 4, to show that these companies' tax liability is equal to total profits minus a threshold amount (in this case, 44.47% of each company's flotation value) multiplied by a percentage-form tax rate: $Tax = 51.71\% \times [P - (44.47\% \times FV)]$. See *ante,* at 9; Brief for Petitioners 10. Because an excess profits tax is generally a tax levied on the profits of a business beyond a particular threshold, see Wells, Legislative History of Excess Profits Taxation in the United States in World Wars I and II, 4 Nat. Tax J. 237, 243 (1951), it appears to follow that the windfall tax can properly be characterized as an excess profits tax.

But not all of the 32 affected companies had an initial

––––––––––

§1.901–2(b)(4)(i)(B) (1999)). To support its argument, the taxpayer introduced empirical evidence that roughly 85% of companies facing mining tax liability had nonrecoverable expenses less than the processing allowance. *Texasgulf, Inc.*, 172 F. 3d, at 215–216. The Court of Appeals agreed with the taxpayer that the tax was a creditable income tax because it was clear that the mining tax was attempting to reach net income, albeit by using an estimate to calculate deductions. *Id.,* at 216–217. This result is sensible: A company that happens to have deductible expenses greater than the fixed amount set by the processing allowance is not an instructive outlier regarding the mining taxes predominant character. The mining tax is attempting to reach that company's net income, but fails to do only because it relies on an approximate value for deductions.

period length of 1,461 days; 5 of the companies had different initial periods. See App. 34, 39–41. When these different initial period values are inserted into the formulation proposed by PPL, two results follow. First, these companies have tax rates different from the 51.71% rate the Court calculates for the 27 other companies. Second, their excess profits threshold also varies.

For example, consider Railtrack Group, a clear outlier with an initial period of 316 days. Inserting this value into the stipulated formula yields the following:

$$Tax = 23\% \times \left[\left(365 \times \frac{P}{316} \times 9\right) - FV\right]$$

Applying the Court's algebra, this formula can be reduced to the following: *Railtrack Group's Tax* $= 239.10\% \times [P - (9.62\% \times FV)]$. Railtrack Group's "effective" tax rate and its excess profits threshold (239.10% and 9.62% respectively) are very different from those companies with the common initial period length of 1,461 days (51.71% and 44.47%). See *ante,* at 10. Railtrack Group is not alone in this respect: four other companies also had tax rates and excess profits thresholds that differed from the majority of affected companies. See App. 34, 38–40.[2]

Once these outlier companies are included in the creditability analysis, it becomes clear that the windfall tax "is *not* an income tax . . . for all persons" subject to it. 26 CFR

––––––––––

[2] The figures for the other four companies are as follows: Powergen plc, which had an initial period of 1,463 days had a tax rate of 51.64% and an excess profits threshold of 44.54%, App. 38–39; National Power plc, which had an initial period of 1,456 days, had a rate of 51.89% and a threshold of 44.32%, *id.,* at 39–40; Northern Ireland Electricity plc, which had an initial period of 1,380 days, had a rate of 54.75% and a threshold of 42.01%, *id.,* at 40; and British Energy plc, which had an initial period of 260 days, had a rate of 290.60% and a threshold of 7.91%, *id.,* at 34. British Energy, however, did not end up having any windfall tax liability. *Id.,* at 33.

§1.901–2(a)(1) (emphasis added).  A typical income tax applies a fixed percentage rate to a base income that varies across taxpayers.  An excess profits tax does the same, but incorporates a threshold, which may or may not vary across taxpayers, to exempt a portion of the base from taxation.  In contrast, here both of the rate and threshold components vary from company to company according to the D variable.[3]

Seen through this lens, the windfall tax is really a tax on average profits.  See Alstott Brief 28–30.  Under the parties' stipulated form of the windfall tax, each company pays a fixed tax rate of 23% on a base that is calculated by first multiplying a company's daily average profits during its initial period (*i.e.,* $(P/D)$ , or total profits over the initial period divided by the length of the initial period) by a fixed price-to-earnings ratio; and then subtracting that company's flotation value (*FV*).  See *ante,* at 2.  In practice, this means that, for example, a company that earns $100 million over 1,461 days would pay approximately the same amount of taxes as a company that has earned $25 million over 365 days.  These two companies would have almost the same *average* profits.  See Alstott Brief 28.  This is not how an income tax works.

The difference between a tax on profits and tax on average profits is especially significant for properly characterizing a tax such as the windfall tax. Average daily profits multiplied by a price-to-earnings ratio, rather than being a

_____

[3] At oral argument, PPL contended that an excess profits tax in which the excess profits threshold varies according to market capitalization would also have an effective tax rate that varies across taxpayers but remains creditable.  Tr. of Oral Arg. 26–27.  That might be true, but that does not describe the situation here.  In PPL's hypothetical, any shift in the effective tax rate depends on the profits threshold; Here, under PPL's version of the windfall tax, both the effective tax rate and the profits threshold move proportionately to a company's initial period length.

way of approximating income, is a way of approximating
value.[4]   See Thompson, A Lawyer's Guide to Modern Val-
uation Techniques in Mergers and Acquisitions, 21 J.
Corp. L. 457, 532–533 (1996) (describing similar valuation
techniques using price-to-earnings ratios).   Accordingly,
incorporating an outlier like Railtrack Group into the
predominant character analysis suggests that the windfall
tax is a tax on a company's value.   Railtrack Group and
the companies like it are not random outliers, Brief for
Petitioners 38, n. 3, but instead are critical pieces of data
for understanding how the tax actually functioned as a
matter of "economic realit[y]."   *Commissioner* v. *Southwest
Exploration Co.*, 350 U. S. 308, 315 (1956).

   This argument, however, rests on the premise that
because the relevant regulations state that "a tax either is
or is not an income tax, in its entirety, for all persons
subject to the tax," 26 CFR §1.901–2(a)(1)(ii), a tax's pre-
dominant character must be as an income tax for *all* tax-
payers.   But if a tax only needs to be an income tax for
"a substantial number of taxpayers" and does not have to
"satisfy the predominant character test in its application
to all taxpayers," *Exxon Corp.* v. *Commissioner*, 113 T. C.
338, 352 (1999), then this average profits argument cannot
get off the ground.   Under this reading, the regulations tell
courts to treat outliers like Railtrack Group as flukes.

   At oral argument, the Government apparently rejected
the notion that "outliers" like Railtrack Group are relevant
to creditability analysis.   See Tr. of Oral Arg. 35–39.   The
Government also did not argue these outliers' relevance

---

[4] Petitioners suggested at oral argument that because some of the
outlier taxpayers may have been subject to a more favorable regulatory
regime in the wake of their privatization, their outsized tax rates are
less meaningful because they could recoup their windfall tax burdens.
See *id.*, at 16–17.   Even accepting the premise of this argument, it still
does not change that fact that in "substance," *ante,* at 9, the tax func-
tioned as value tax for these companies.

before the Court of Appeals, *ante,* at 14, n. 6, and so this argument, and the regulatory interpretation it depends upon, has only been presented to this Court by *amici*, see Alstott Brief 17–18, 28–30. We are not barred from considering statutory and regulatory interpretations raised in an *amicus* brief, but we should be "reluctant to do so," *Davis* v. *United States*, 512 U. S. 452, 457, n. (1994), when the issue is one of first impression and the Federal Government has staked out what appears to be a contrary position. Thus, while I find this argument persuasive, I do not base my analysis of this case on it and therefore concur in the Court's opinion.