# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

COMERICA, INC v DEPARTMENT OF TREASURY

Docket No. 161661. Argued December 8, 2021 (Calendar No. 1). Decided June 7, 2022.

Comerica, Inc., sought review in the Tax Tribunal of a 2013 decision by the Department of Treasury to deny tax credits for brownfield and historic-restoration activity that Comerica had claimed under the since repealed Single Business Tax Act (SBTA), 1975 PA 228. In 2005, one of Comerica's subsidiaries—KWA I, LLC—had assigned these credits to another Comerica subsidiary, a Michigan bank. In 2007, the Michigan bank merged with a third Comerica subsidiary, a Texas bank. Around the same time, the Legislature repealed the SBTA, see 2006 PA 325, and enacted a successor, the Michigan Business Tax Act (MBTA), 2007 PA 36 (since repealed by 2019 PA 90). Comerica filed returns under the MBTA for the tax years 2008–2011, identifying the Texas bank, but not the Michigan bank, among its subsidiaries, and claiming refunds based in part on the credits that had been assigned to the Michigan bank under the SBTA. In 2013, the Department of Treasury audited Comerica's returns and disallowed the claimed credits on the basis of two SBTA provisions, former MCL 208.38g(18) and former MCL 208.39c(7), which barred assignees of credits from subsequently assigning those credits. Comerica sought review before the Tax Tribunal, arguing that the credits had passed to the Texas bank not as the result of a subsequent assignment but by operation of law, as a result of the merger with the Michigan bank. The parties cross-moved for summary disposition under MCR 2.116(C)(10). The Tax Tribunal, citing *Kim v JPMorgan Chase Bank, NA*, 493 Mich 98 (2012), granted partial summary disposition to the Department of Treasury, ruling that the credits had not passed to the Texas bank in the merger but rather had been extinguished. The Court of Appeals, BOONSTRA, P.J., and RIORDAN and REDFORD, JJ., vacated in part, reversed in part, and remanded, noting that although former MCL 208.38g(18) and former MCL 208.39c(7) prohibited any assignment of credits beyond the initial assignment, those provisions were silent regarding transfers made by any other mechanism, such as transfers made by operation of law pursuant to a merger of entities. Accordingly, the Court of Appeals agreed with Comerica that the tax credits had been transferred by operation of law and that those transfers thus were not barred by the SBTA's single-assignment provisions. The Court of Appeals also held, contrary to the Tax Tribunal's conclusions, that the rule of strict construction for tax exemptions does not apply to tax credits and that the tax credits were property rather than privileges. 332 Mich App 155 (2020). The Supreme Court granted the Department of Treasury's application for leave to appeal. 507 Mich 888 (2021).

In an opinion by Justice CLEMENT, joined by Justices ZAHRA, VIVIANO, and BERNSTEIN, the Supreme Court *held*:

Tax credits that had been lawfully acquired by one Comerica subsidiary, a Michigan bank, passed by operation of law under the Banking Code, MCL 487.11101 *et seq*., to another Comerica subsidiary, a Texas bank, when the two banks merged. Accordingly, the provisions of the SBTA that prohibited an assignee of credits from subsequently assigning those credits did not explicitly or implicitly interfere with the Banking Code's operation in this case. Therefore, the Department of Treasury erred by not allowing Comerica to claim these credits on its returns for tax years 2008–2011, and the Tax Tribunal erred by granting the department partial summary disposition. The Court of Appeals' judgment was affirmed.

1. Former MCL 208.38g and former MCL 208.39c provided, in relevant part, that a qualified taxpayer could assign a credit to its partners, members, or shareholders, but that those assignees could not subsequently assign those credits or any portion of those credits. In this case, KWA was the qualified taxpayer, and it was undisputed that KWA could lawfully assign its credits to the Michigan bank. Although the Department of Treasury argued that the SBTA barred the Michigan bank, as an assignee, from becoming an assignor by subsequently assigning the credits to the Texas bank, it offered no evidence that the Michigan bank assigned, or tried to assign, the credits. Instead, as Comerica correctly argued, the credits passed to the Texas bank not by assignment but by operation of law—specifically, the Banking Code, which governs consolidations and mergers of banks. MCL 487.13703(1) provides in part that if a consolidation agreement has been certified and approved, the corporate existence of each consolidating organization is merged into and continued in the consolidated bank. To the extent authorized by the Banking Code, the consolidated bank then possesses all the rights, interests, privileges, powers, and franchises and is subject to all the restrictions, disabilities, liabilities, and duties of each of the consolidating organizations. MCL 487.13703(1) further specifies that the title to all property is transferred to the consolidated bank and may not revert or be impaired by reason of the act. While the parties disagreed about whether the credits should be considered privileges or property, this distinction made no difference to the outcome in this case because, under the Banking Code, the consolidated bank acquires both the privileges and property of the consolidating organizations, by operation of law, not by assignment or by any other act of the consolidating organizations. The distinction between a voluntary act of assignment and a transfer by operation of law was described in *Miller v Clark*, 56 Mich 337 (1885), and this distinction was relied on in *Kim*. Thus, regardless of whether the SBTA credits are considered property or privileges, MCL 487.13703 operated to transfer the credits from the Michigan bank to the Texas bank, and no assignment was needed.

2. The assignment provisions of the SBTA did not implicitly bar the credits from being possessed by anyone but the initial assignee. The negative-implication canon of statutory construction—*expressio unius est exclusio alterius*—means that the express mention of one thing implies the exclusion of other similar things. However, this canon does not apply without a strong enough association between the specified and unspecified items, according to common understandings of the specified items and the context in which they are used. In this case, the Department of Treasury offered no reason to think that the SBTA's mention of "assign[ing]" and not "subsequently assign[ing]" credits suggests that the Legislature meant to regulate all the ways that credits could be transferred so that when the Legislature said only "assign" it was impliedly

prohibiting other forms of transfer.  Because there was no apparent contextual or circumstantial predicate for invoking the negative-implication canon, it was not applied.

3.  Assuming that the canon of strict construction applies to statutes regulating the possession of tax credits, it may be invoked only as a last resort.  The directive to strictly construe certain tax statutes in favor of the government reflects a judicial preference against tax exemptions.  However, that preference is not aimed at revealing the semantic content of a statute, and it sheds no light on the statute's meaning.  Courts will only employ the canon of strict construction if the statutory meaning fails to emerge after the ordinary rules of interpretation are applied.  Because the SBTA's ordinary meaning was discernible by examining the text and context of its relevant provisions, strict construction played no role in this case.

Affirmed.

Justice CAVANAGH, joined by Chief Justice MCCORMACK and Justice WELCH, concurring in the result, explained that the certificated tax credits at issue in this case, which were earned through brownfield and historic-restoration activity, flowed from the fulfillment of a contract-like arrangement between the government and a taxpayer and required the taxpayer to expend a significant amount of time, effort, and capital to earn them.  She concurred with the majority that regardless of whether the certificated credits were construed as rights, interests, privileges, powers, or franchises such that Comerica-Texas simply possessed them or instead as "property" that was transferred to Comerica-Texas, neither scenario constituted an "assignment" as contemplated by the SBTA, whose single-assignment limitation did not affect how property was allocated between merging banks under MCL 487.13703(1).  Contrary to the Court of Appeals' holding, she did not view the *expressio unius est exclusio alterius* canon of statutory interpretation as particularly applicable, explaining that the SBTA's limitation on single assignments was not sufficient to suggest an exclusive or exhaustive means of transfer.  For these reasons, she agreed that the Court of Appeals' decision should be affirmed.

Justice WELCH, concurring in part and dissenting in part, stated that the Court of Appeals decision reached the right result but went too far in declaring the tax credits at issue in this case to be vested property rights.  Under MCL 487.13703, Comerica-Texas, as the consolidated bank following the merger, held all rights of property, franchises, and interests in the same manner and to the same extent as those rights and interests were held by each consolidating organization at the time of the consolidation, and was also subject to all the restrictions, disabilities, liabilities, and duties of each of the consolidating organizations, effectively rendering Comerica-Texas and Comerica-Michigan one and the same as a matter of law.  She noted that not only was there no statutory prohibition on Comerica-Texas claiming the disputed tax credits by the terms of the merger, it would have been unjust and contrary to legislative intent to hold otherwise, given Comerica's efforts to redevelop brownfields and historic properties and the Legislature's goal of monetarily incentivizing these private-public redevelopment partnerships.  She concluded that allowing petitioner to claim the earned tax credits would hold the state to its side of the bargain, and she saw nothing that would indicate a legislative intent to disallow petitioner from claiming the earned tax credits in this situation.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED  June 7, 2022

S T A T E  O F  M I C H I G A N

SUPREME COURT

COMERICA, INC.,

      Plaintiff-Appellee,

v

No. 161661

DEPARTMENT OF TREASURY,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

CLEMENT, J.

In this taxpayer protest, Comerica seeks to redeem certain tax credits over the Department of Treasury's objection. The credits were earned under the Single Business Tax Act by a Comerica affiliate. That subsidiary assigned the credits to another subsidiary, a Michigan bank. Later, Comerica created a third subsidiary, a Texas bank, and merged the Michigan bank into the Texas bank. Comerica then claimed the tax credits, on behalf of the Texas bank, in its Michigan tax filings. The Department of Treasury disallowed the

tax credits, concluding that the Texas bank did not receive the Michigan bank's credits through the merger because the Michigan bank lacked the legal authority to transfer the credits. We hold that the tax credits could lawfully pass to the Texas bank.

## I. BACKGROUND

Comerica, Inc. is a bank-holding corporation with many subsidiaries, of which three are relevant here. The first is KWA I, LLC. Before 2005, KWA earned tax credits relating to brownfield and historic-restoration activity. Those credits were governed in part by the Single Business Tax Act, 1975 PA 228, which allowed the entity earning a credit to assign it. In 2005, KWA assigned its credits to the second Comerica subsidiary, a Michigan bank. In 2007, Comerica created the third subsidiary, a Texas bank. Soon afterward, the Michigan and Texas banks entered into an "agreement and plan of merger." As of October 31, 2007, Comerica considered the Michigan bank to have "merged into" the Texas bank. And Comerica understood the merger to have caused the Michigan bank's tax credits to pass to the Texas bank.

Around the same time, the Legislature repealed the Single Business Tax Act, see 2006 PA 325, and enacted a successor, the Michigan Business Tax Act, 2007 PA 36.[1] Comerica filed returns under the MBTA for the tax years 2008–2011, identifying the Texas bank, but not the Michigan bank, among its subsidiaries. In each return, Comerica claimed a refund, relying in part on the credits that had been assigned to the Michigan bank under

---

[1] The Michigan Business Tax Act was itself repealed in 2019, see 2019 PA 90, although that repeal does not take effect until tax years starting after December 31, 2031.

the SBTA. Although the SBTA had been repealed, the MBTA, MCL 208.1435 and MCL 208.1437, recognized the credits' continued existence.

In 2013, the Department of Treasury audited Comerica's returns, disallowed the claimed credits, and reduced Comerica's refunds accordingly. Treasury pointed to two SBTA provisions, MCL 208.38g(18) and MCL 208.39c(7), which governed assignment of the credits. In particular, each provision allowed the entity earning the credit to assign it, and so Treasury recognized as valid KWA's assignment of the credits to the Michigan bank. But those provisions didn't let an assignee "subsequently assign a credit or any portion of a credit assigned"—in other words, the provisions barred a second assignment. From Treasury's view, a second assignment was the only way the Texas bank could acquire the Michigan bank's credits through the merger. Treasury thus treated the credits as void and reduced Comerica's refunds.[2]

Comerica unsuccessfully challenged Treasury's decision in an informal conference before a Treasury hearing referee. Comerica then sought review before the Tax Tribunal, arguing that there had been no second assignment of the credits; rather, it argued, under Texas corporation law and Michigan banking law, the credits passed to the Texas bank as a result of the merger, "by operation of law." Treasury argued that the credits were governed by the SBTA alone—that Texas corporation law and Michigan banking law didn't bear on the credits' status. The parties cross-moved for summary disposition under MCR 2.116(C)(10).

---

[2] Treasury further reduced Comerica's refunds because of an issue related to calculation of Comerica's "net capital." That issue is not presently before us.

The Tax Tribunal, citing *Kim v JPMorgan Chase Bank, NA*, 493 Mich 98; 825 NW2d 329 (2012), acknowledged the possibility that credits could be transferred by operation of law, but it believed that *Kim* required such a transfer to be "unintentional or involuntary." Any transfer here, the tribunal believed, was not "unintentional or involuntary" since Comerica had chosen to merge the transferee and transferor banks. The tribunal thus concluded that the credits had not passed to the Texas bank but rather had been "extinguished" when the Michigan bank merged into the Texas bank. In so doing, the tribunal rejected Comerica's argument that the credits had passed to the Texas bank under a merger provision in the Texas Business Organizations Code. That provision allocates title to "*property* owned by each [merging] organization to . . . the surviving or new organization[] . . . without . . . any transfer or assignment having occurred." Tex Bus Orgs Code Ann 10.008(a)(2)(C) (emphasis added). But the tribunal, citing federal law, declared the credits to be not "property" but rather "privileges," a term omitted from the Texas law. Finally, the tribunal applied to tax credits the rule of "strict construction for tax exemptions." For all these reasons, the tribunal concluded that Treasury had appropriately disallowed the tax credits and, accordingly, granted partial summary disposition to Treasury.

Comerica challenged the Tax Tribunal's ruling in the Court of Appeals, which reversed in relevant part. See *Comerica, Inc v Dep't of Treasury*, 332 Mich App 155; 955 NW2d 593 (2020). The Court of Appeals recognized that the SBTA, MCL 208.38g(18) and MCL 208.39c(7), forbade an assignee to "subsequently assign a credit or any portion of a credit assigned." *Id*. at 167. But even though the provisions "prohibit[ed] any assignment beyond the first initial assignment," they "address[ed] only transfers made by

4

assignment and [were] silent regarding transfers made by any other mechanism, such as transfers made by operation of law pursuant to a merger of entities." *Id*.

Like the Tax Tribunal, the Court of Appeals recognized that, under *Kim*, "transfers by assignment are distinct from transfers by operation of law." *Id*. at 168. But while the tribunal had read *Kim* to suggest that the credits could be transferred by operation of law only if the merger was "unintentional or involuntary," the Court of Appeals recognized that a "voluntary act of merger" is different from an "automatic transfer of assets resulting from that merger." *Id*. at 172. Here, the Court concluded, "the voluntary act of merging . . . automatically transferred the tax credits by operation of law and precluded application of the SBTA's single-assignment provisions." *Id*. The Court of Appeals disagreed with the tribunal on a couple of other points. First, it determined that the rule of "strict construction for tax exemptions" doesn't extend to tax credits. *Id*. at 169. Second, it determined that the tax credits are "property" rather than "privileges." *Id*. at 171. The Court of Appeals thus reversed the tribunal's grant to Treasury of partial summary disposition.

Treasury applied for our leave to appeal, arguing that the credits were unlawfully assigned when they passed from the Michigan bank to the Texas bank and that the credits were not a "vested right" or a "property right." We granted leave, *Comerica, Inc v Dep't of Treasury*, 507 Mich 888 (2021), and now, for the reasons below, we affirm.

5

## II. DISCUSSION

Treasury primarily contends that the tax credits at issue passed to Comerica's Texas bank in violation of sections 38g and 39c of the Single Business Tax Act, formerly codified at MCL 208.38g and MCL 208.39c. Section 38g(18) stated, in relevant part:

> [T]*he qualified taxpayer may assign* all or a portion of a credit . . . to its partners, members, or shareholders . . . . A partner, member, or shareholder that is *an assignee shall not subsequently assign* a credit or any portion of a credit assigned under this subsection. [Emphasis added.]

Section 39c(7) similarly stated:

> [T]*he qualified taxpayer may assign* all or any portion of a credit . . . to its partners, members, or shareholders . . . . A partner, member, or shareholder that is *an assignee shall not subsequently assign* a credit or any portion of a credit assigned to the partner, member, or shareholder under this subsection. [Emphasis added.]

Both provisions said essentially the same thing: The qualified taxpayer that earned the credit "may assign" that credit, but the credit's "assignee shall not subsequently assign a credit or any portion of a credit assigned." Put otherwise, the assignee cannot later become an assignor.

In the present case, KWA was the "qualified taxpayer," and Treasury recognizes that KWA could and did lawfully assign its credits to the Michigan bank. But Treasury insists that the SBTA barred the Michigan bank, as an assignee, from becoming an assignor by "subsequently assign[ing]" the credits to the Texas bank. We agree—the statute plainly forbids the credits' assignee to later become the credits' assignor. But Treasury has offered nothing to suggest that the Michigan bank *became an assignor*, i.e., that it *assigned* the credits. So while the statute plainly forbade the Michigan bank to assign the credits, there's no evidence that the Michigan bank assigned, or tried to assign, the credits.

6

For its part, Comerica urges that the credits passed to the Texas bank not by assignment but by "operation of law." In other words, the Michigan bank did not need to assign the credits to the Texas bank because the law operated to move the credits from one to the other. Comerica identified as the operative law the Banking Code, 1999 PA 276, which governs how "consolidating organizations" can merge into a "consolidated bank."[3] Section 3703(1) of the Banking Code, MCL 487.13703(1), directs how the particulars of each "consolidating organization" become the particulars of a "consolidated bank":

> If approval and certification of the consolidation agreement . . . have been completed, the corporate existence of each consolidating organization is merged into and continued in the consolidated bank. To the extent authorized by this act, *the consolidated bank possesses all the* rights, interests, *privileges*, powers, and franchises and is subject to all the restrictions, disabilities, liabilities, and duties *of each of the consolidating organizations*. *The title to all property*, real, personal, and mixed, *is transferred to the consolidated bank*, and shall not revert or be in any way impaired by reason of this act. [Emphasis added.]

Under this provision, the consolidated bank acquires each consolidating organization's "rights, interests, privileges, powers, and franchises" and becomes subject to each consolidating organization's "restrictions, disabilities, liabilities, and duties." And "title to all property . . . is transferred to the consolidated bank." As this litigation has developed, the parties have bickered about the nature of the credits, with Treasury persuading the Tax Tribunal that they are "privileges," and Comerica persuading the Court of Appeals that

---

[3] Although Comerica suggested in the Tax Tribunal that Texas law has a role to play in this case, we see no citation to Texas law in the briefing before this Court. While we ordinarily might be reluctant to determine a Texas bank's relationship to tax credits without considering Texas law, we're not reluctant here, where both the tax credits and their assignee are creatures of Michigan law and where the parties have here addressed only Michigan law.

7

they are "property." Yet, as we will explain, it doesn't matter whether they are privileges or property since, under the Banking Code, the consolidated bank acquires the consolidating organizations' privileges and property "by operation of law," not by assignment or by any other act of the consolidating organizations.

When Comerica contends that the SBTA credits *transfer* by operation of law, we take Comerica to mean that the credits are property since the Banking Code identifies only title to "property" (and not "privileges") as "transferred." Notably, the act of transfer is expressed passively, with neither the "consolidating organization" nor the "consolidated bank" charged with acting to effect the transfer. It's true that the consolidating organizations here—the Michigan bank and the Texas bank—needed to act to effect the merger. But the Court of Appeals put it well when it distinguished "the voluntary act of merger" from "the automatic transfer of assets resulting from that merger." *Comerica*, 332 Mich App at 172. Because the transfer is "automatic" under the Banking Code, it makes sense to characterize the Banking Code itself, i.e., the "law," as effecting the transfer—hence, transfer "by operation of law."[4]

Our reasoning has ample and long-standing support in our caselaw. Well over a century ago, in *Miller v Clark*, 56 Mich 337; 23 NW 35 (1885), we distinguished a "voluntary act" of assignment from a transfer "by operation of law":

> The assignments which are required to be recorded are those which are executed by the voluntary act of the party, and this does not apply to cases where the title is transferred by operation of law[.] [*Id.* at 340-341.]

---

[4] See, e.g., *United States v Seattle–First Nat'l Bank*, 321 US 583, 587-588; 64 S Ct 713; 88 L Ed 844 (1944) (explaining that if "the immediate mechanism by which the transfer is made effective" is "entirely statutory," then the transfer is "wholly by operation of law").

8

We relied on *Miller*'s distinction relatively recently, in *Kim v JPMorgan Chase Bank, NA*, 493 Mich 98; 825 NW2d 329 (2012), explaining that *Miller* is consistent with *Black's Law Dictionary* and emphasizing the "automatic" nature of a transfer "by operation of law":

> *Miller*'s interpretation of when a transfer occurs by "operation of law" is consistent with *Black's Law Dictionary*'s definition of the expression. *Black's* defines "operation of law" as "[t]he means by which a right or a liability is created for a party *regardless of the party's actual intent*." Similarly, this Court has long understood the expression to indicate "the manner in which a party acquires rights *without any act of his own*." Accordingly, there is ample authority for the proposition that a transfer that takes place by operation of law occurs unintentionally, involuntarily, or through no affirmative act of the transferee. [*Id*. at 110.[5]]

We continue to agree with *Kim*'s and *Miller*'s distinction between an assignment effected by a voluntary act and a transfer effected by an automatic, statutory process, i.e., "by operation of law."[6]

As *Kim* and *Miller* show, the law itself can effect a transfer of title to property. It thus is not necessarily true, as Treasury suggests, that a transfer of the credits from the Michigan bank implies an assignment by the Michigan bank. As explained above, section 3703 of the Banking Code can trigger a transfer without an assignment. Here, if the SBTA credits are property, section 3703 operated to transfer the credits from the Michigan bank to the Texas bank. No assignment was needed.

---

[5] Quoting *Black's Law Dictionary* (9th ed); *Merdzinski v Modderman*, 263 Mich 173, 175; 248 NW 586 (1933) (citation and quotation marks omitted).

[6] Treasury urges that we should decline to rely on *Kim* (and, by implication, on *Miller*) because it involved transfers of mortgages, not tax credits. We take the point, that lessons from a decision in one domain shouldn't be naïvely applied in another domain. But Treasury offers no reason to limit *Kim* and *Miller*'s teaching on automatic, statutory transfers to mortgages, and we see none.

9

What then if the tax credits are, as Treasury proposes, "privileges"? The answer is the same. As noted above, under section 3703, "the consolidated bank possesses all the . . . privileges . . . of each of the consolidating organizations." The language is plain: All privileges of a consolidating organization become possessed by the consolidated bank. While the Banking Code characterizes as a "transfer" the conferring of title to property, it doesn't so characterize the conferring of attributes like privileges—instead, it simply declares what attributes of the consolidating organization "the consolidated bank possesses." In any event, whether privileges are characterized as the subject of a transfer or some other thing, they are not the subject of an assignment.[7]

We cannot escape the statute's plain meaning, i.e., that the Michigan bank's privileges were conferred on the Texas bank "by operation of" the Banking Code, not by assignment. If the credits are privileges, no assignment was needed for them to pass to the Texas bank.

---

Treasury offers an alternative perspective on the SBTA's assignment provisions: Even if the Michigan bank didn't violate those provisions by becoming an assignor, the

---

[7] The Michigan Bankers Association, as amicus curiae, urges us to conclude that there was no transfer here. The Association points out that under section 3703(1), "the corporate existence of each consolidating organization is merged into and continued in the consolidated bank"—in other words, the Michigan bank's existence is "continued in the" Texas bank, and so the credits haven't changed hands. As the Association acknowledges, section 3703(1) also states that "title to all property . . . is transferred to the consolidated bank." Put otherwise, while the Association says there was no transfer, the Banking Code expressly refers to title to property being "transferred." Since the parties' arguments are adequate to resolve this case, we decline to engage further with the Association's reading of section 3703(1).

10

credits couldn't pass to the Texas bank because those provisions implicitly barred the credits from leaving the Michigan bank's possession. In other words, Treasury argues that the SBTA's regulation of initial assignments bars the credits from afterward being possessed by anyone but the initial assignee. Treasury thus relies on the negative-implication canon, often called by its hoary epithet, *expressio unius est exclusio alterius*.

Under this canon of statutory construction, the express mention of one thing implies the exclusion of other similar things. *Detroit v Redford Twp*, 253 Mich 453, 456; 235 NW 217 (1931). As we have recently explained, however, the canon "properly applies only when the *unius* (or technically, *unum*, the thing specified) can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved." *Bronner v Detroit*, 507 Mich 158, 173; 968 NW2d 310 (2021), quoting Scalia & Garner, *Reading Law* (St. Paul: Thomson/West, 2012), p 107. The canon thus does not apply without a strong enough association between the specified and unspecified items. See *Chevron USA Inc v Echazabal*, 536 US 73, 81; 122 S Ct 2045; 153 L Ed 2d 82 (2002). That association is evaluated according to common understandings of the specified items and the context in which they are used. See generally *United States v Vonn*, 535 US 55, 65; 122 S Ct 1043; 152 L Ed 2d 90 (2002); *Reading Law*, p 107.

Scalia and Garner illustrate this point with a couple of examples involving common restaurant signs. The first example:

> The sign outside a restaurant "No dogs allowed" cannot be thought to mean that no other creatures are excluded—as if pet monkeys, potbellied pigs, and baby elephants might be quite welcome. Dogs are specifically addressed because they are the animals that customers are most likely to bring in; nothing is implied about other animals. [*Reading Law*, p 107.]

11

The second example:

> Consider the sign at the entrance to a beachfront restaurant: "No shoes, no shirt, no service." By listing some things that will cause a denial of service, the sign implies that other things will not. One can be confident about not being excluded on grounds of not wearing socks, for example, or of not wearing a jacket and tie. But what about coming in without pants? That is not included in the negative implication because the specified deficiencies in attire noted by the sign are obviously those that are common at the beach. Others common at the beach (no socks, no jacket, no tie) will implicitly not result in denial of service; but there is no reasonable implication regarding wardrobe absences *not* common at the beach. They go beyond the category to which the negative implication pertains. [*Id*. at 108.]

In each example, the negative implication is restrained by the expression of prohibitions (dogs or going shirtless or shoeless), the circumstances to which the prohibitions apply (restaurant or beachfront restaurant), and common understandings (about people's behavior with pets or at the beach). We thus understand that a restaurant with both signs would welcome neither a pantsless man nor the horse he rode in on.

Here, the question is whether the SBTA's mention of "assign[ing]" and not "subsequently assign[ing]" credits suggests anything about how credits otherwise pass between entities. Treasury offers no reason to think that the Legislature meant to regulate all the ways that credits could be transferred so that when the Legislature said only "assign" it was impliedly prohibiting other forms of transfer. For instance, by analogy to the "no dogs allowed" example, Treasury might have asserted that "assigning" is singled out in the statute because it is "the action that tax-credit holders are most likely to perform." To be clear, that reasoning sounds dubious to us, but the point is that Treasury hasn't explained how expressly regulating credit assignments implies anything about how credits can otherwise change hands; nor has it pointed to any language in the SBTA suggesting an

intention to regulate all transfers of tax credits.[8]  Unlike restaurant signs' expression of "dogs" or of seaside sartorial omissions, the SBTA's expression about "assigning" implies very little, in our "[c]ommon sense." *Bronner*, 507 Mich at 173, quoting *Reading Law*, p 107.[9]

In short, we see no contextual or circumstantial predicate for invoking the negative-implication canon, and so we decline to apply it here.

---

Treasury has urged us to "strictly construe" the SBTA's tax-credit provisions against Comerica.  We initially question whether the canon of strict construction applies to statutes governing tax credits.  This case doesn't ask us to determine whether those tax credits were appropriately awarded in the first place—Treasury hasn't disputed that KWA earned them fair and square.  We're instead looking at provisions governing how those credits can pass between a corporation's subsidiaries.  It is not obvious that provisions like that should be "strictly construed."

But even if the "canon of strict construction" applies to statutes regulating the possession of tax credits, it may be invoked only as a "last resort."  *TOMRA of North America, Inc v Dep't of Treasury*, 505 Mich 333, 343; 952 NW2d 384 (2020).  As we

[8] By contrast, the Banking Code, MCL 450.13703(1), mandates that the consolidated bank acquires all the consolidating organizations' privileges and property—a strong clue that the Legislature favors free flow of privileges and property in a merger.

[9] Incidentally, our common sense today is consistent with our thinking in *Miller* in 1885. The statute there mentioned "assignment" but not other transfers, and yet we inferred the possibility of transfer by operation of law.  *Miller*, 56 Mich at 340-341; see also *Kim*, 493 Mich at 109-110.

13

recently explained, the directive to strictly construe certain tax statutes in favor of the government reflects a judicial "preference against tax exemptions." *Id*. at 340. That preference, whatever its merit, isn't aimed at "reveal[ing] the semantic content of a statute," *id*. at 343—that is, it doesn't "shed any light" on the statute's meaning, *id*. at 342. Only if that meaning fails to emerge after we apply "the ordinary rules of interpretation" may we put our thumb on the scales and construe a statute against the taxpayer. *Id*. at 343. Here, as indicated above, the SBTA's "ordinary meaning is discernible" by examining the text and context of its relevant provisions, *id*.; "strict construction" thus plays no role here.

## III. CONCLUSION

This appeal asked us to decide whether tax credits lawfully acquired by one Comerica subsidiary, a Michigan bank, could lawfully pass to another Comerica subsidiary, a Texas bank, when the two banks merged. As explained above, the Single Business Tax Act barred the Michigan bank from assigning the credits, but no such assignment was attempted here. Rather, the Banking Code let the Texas bank acquire the credits "by operation of law." The SBTA did not explicitly or implicitly interfere with the Banking Code's operation.

For these reasons, we conclude that the credits could lawfully pass to the Texas bank. We, therefore, affirm the Court of Appeals' judgment.

Elizabeth T. Clement<br>
Brian K. Zahra<br>
David F. Viviano<br>
Richard H. Bernstein

14

STATE OF MICHIGAN

SUPREME COURT


COMERICA, INC.,

      Plaintiff-Appellee,

v                                        No. 161661

DEPARTMENT OF TREASURY,

      Defendant-Appellant.

_____

CAVANAGH, J. (*concurring in the result*).

This case involves a dispute over certificated tax credits issued under the now long-repealed Single Business Tax Act (SBTA), former MCL 208.1 *et seq*. Unlike a tax credit for overpayment or a credit intended to offset tax liability, certificated credits flow from the fulfillment of a contract-like arrangement between the government and a taxpayer. The two types of certificated credits at issue are earned through brownfield and historic-restoration activity. To summarize, in order to promote the redevelopment of brownfield property,[1] the Michigan Legislature enacted the Brownfield Redevelopment Financing Act (BRFA), MCL 125.2651 *et seq*. In addition to financing available under the BRFA, the Legislature also provided for tax credits for property owners who undertook brownfield projects. To become eligible for the brownfield tax credits, the property owner was

_____

[1] A "brownfield" is generally regarded as real property that has the presence or potential presence of hazardous substances, pollutants, or contaminants that hinder expansion, redevelopment, or reuse. See 42 USC 9601(39). In Michigan, a brownfield also broadly includes certain noncontaminated properties such as "blighted" or "functionally obsolete" properties. MCL 125.2652.

required to submit an application to the Michigan Economic Growth Authority (MEGA) demonstrating that the project met requirements for job creation and retention, construction, rehabilitation, and development. See MCL 207.808. If MEGA approved the application, it would enter into an agreement with the taxpayer for the brownfield tax credits under the SBTA that would become available once the project was complete. The credit was worth 10% of the taxpayer's eligible investments, up to $1 million, and the taxpayer could carry the credit forward for 10 years to offset any subsequent tax liability under the SBTA.

Similarly, under the SBTA, property owners were incentivized to rehabilitate and preserve historic properties in exchange for tax credits. To obtain a historic-restoration credit, the taxpayer would apply for certification from the State Historic Preservation Office or the National Parks Service, submit a rehabilitation plan, and, upon completion of the project, seek a certificate of completed rehabilitation. If the rehabilitation was in conformity with the plan approved, a certificate of completion was issued, making the taxpayer eligible for a 25% credit for qualified expenditures. Like the brownfield credits discussed earlier, the historic-restoration credit was also able to be carried forward for 10 years. In sum, to earn the certificated tax credits at issue, the taxpayer was required to expend a significant amount of time, effort, and capital.[2]

The credits at issue were earned by a Comerica, Inc., affiliate and subsequently assigned to a Comerica subsidiary (Comerica-Michigan). Comerica-Michigan later

---

[2] With this in mind, I find the Department's suggestion that we "strictly construe" the SBTA's tax credit provision against Comerica unpersuasive. See *Canterbury Health Care v Dep't of Treasury*, 220 Mich App 23, 313; 558 NW2d 444 (1996) (holding that tax *exemptions* are strictly construed in favor of the taxing authority).

merged with another Comerica subsidiary (Comerica-Texas). Because the SBTA prohibited a subsequent assignment of the certificated tax credits, former MCL 208.38g(18) and former MCL 208.39c(7), the question before the Court is whether the credits are properly held by Comerica-Texas as a result of the merger—or, as the Department argues, whether Comerica-Texas's acquisition of the credits via a merger constitutes an improper second assignment of the certificated tax credits.

I concur with the majority that, whether the certificated credits are construed as either "rights, interests, privileges, powers, [or] franchises" such that Comerica-Texas simply "possesses" them or as "property" such that it was "transferred" to Comerica-Texas, neither scenario constitutes an "assignment" as contemplated by the SBTA. The SBTA's single-assignment prohibition does not affect how property is allocated between merging banks under MCL 487.13703(1), a provision of the Banking Code, MCL 487.11101 *et seq.*[3] The SBTA spoke only to limiting assignments; it did not mention what would happen to certificated credits in a bank merger. "Michigan courts determine the Legislature's intent from its *words*, not from its silence." *Donajkowski v Alpena Power Co*, 460 Mich 243, 261; 596 NW2d 574 (1999). Contrary to the Court of Appeals' holding, I do not see

---

[3] MCL 487.13703(1) provides:

> If approval and certification of the consolidation agreement as required by [MCL 487.13701] have been completed, the corporate existence of each consolidating organization is merged into and continued in the consolidated bank. To the extent authorized by this act, the consolidated bank possesses all the rights, interests, privileges, powers, and franchises and is subject to all the restrictions, disabilities, liabilities, and duties of each of the consolidating organizations. The title to all property, real, personal, and mixed, is transferred to the consolidated bank, and shall not revert or be in any way impaired by reason of this act.

the *expressio unius est exclusio alterius* canon of statutory interpretation as particularly applicable in this case. As the majority explains, this canon is animated by context and reasonability. See *Bronner v Detroit*, 507 Mich 158, 173; 968 NW2d 310 (2021). The SBTA's limitation on single assignments is simply not sufficient to suggest an exclusive or exhaustive means of transfer.

For these reasons, I agree that the Court of Appeals' decision should be affirmed, and I concur in the result reached by the Court majority.

Megan K. Cavanagh
Bridget M. McCormack
Elizabeth M. Welch

COMERICA, INC.,

       Petitioner-Appellee,

v                                              No. 161661

DEPARTMENT OF TREASURY,

       Respondent-Appellant.

_____

WELCH, J. (*concurring in part and dissenting in part*).

I join Justice CAVANAGH's concurring opinion. We can resolve this case by focusing less on legal abstractions and instead returning to first principles of how this Court has historically interpreted tax-related statutes. This Court has long recognized "that taxing is a practical matter and that the taxing statutes must receive a practical construction." *In re Brackett's Estate*, 342 Mich 195, 205; 69 NW2d 164 (1955). Substance governs over form. See 23 Michigan Civil Jurisprudence, Taxes, § 37, p 222 ("A court, in reading taxation statutes, should disregard form for substance and place an emphasis on economic reality."). It is a "black-letter principle that 'tax law deals in economic realities, not legal abstractions.' " *PPL Corp v Comm'r of Internal Revenue*, 569 US 329, 340; 133 S Ct 1897; 185 L Ed 2d 972 (2013), quoting *Comm'r v Southwest Exploration Co*, 350 US 308, 315; 76 S Ct 395; 100 L Ed 347 (1956). Applying this lens, this case is easily resolved.

The parties agree on the basic facts. Petitioner's subsidiary earned brownfield-restoration and historic-preservation tax credits by completing certain approved projects. In accordance with the applicable statutory scheme—the since repealed Single Business

Tax Act (SBTA), former MCL 208.1 *et seq.*—in 2005 the subsidiary properly assigned these credits to Comerica Bank, a Michigan banking corporation (Comerica-Michigan). Under the SBTA, such credits could only be assigned once. Former MCL 208.38g(18); former MCL 208.39c(7). Comerica-Michigan later merged with Comerica Bank, a Texas banking association (Comerica-Texas). Following the merger, Comerica-Michigan ceased to exist as a separate entity. The parties now disagree on whether petitioner can lawfully claim Comerica-Michigan's earned, but never used, and already once-assigned tax credits.

I think the Court of Appeals decision reached the right result but went too far in declaring the tax credits at issue in this case "vested" property rights. This Court has never understood tax credits in this manner, and it was unnecessary for the Court of Appeals to do so here. Viewing tax credits as vested property rights has the potential to greatly disturb our state government's system of taxation. Unsurprisingly, our Court of Appeals in an earlier decision held that "because any 'rights' that arise under a tax statute are purely a result of legislative 'grace,' the Legislature is free to take such a 'right' away at any time . . . ." *Ludka v Dep't of Treasury*, 155 Mich App 250, 259-260; 399 NW2d 490 (1986) (finding "no vested right in a foreign tax credit" or "in a tax statute or in the continuance of any tax law"). Similarly, although never speaking in such absolute terms, this Court has held that the Legislature, within the limits of the Constitution, has broad discretion over taxation. *Hudson Motor Car Co v Detroit*, 282 Mich 69, 79; 275 NW 770 (1937). This Court emphasized, however, that broad discretion is not limitless discretion. *Id.* For instance, "[t]he control of the state in regard to taxation . . . can not be exercised in an arbitrary manner, nor without regard to those principles of justice and equality on which it is based." *Ryerson v Utley*, 16 Mich 269, 276 (1868).

2

In order to resolve the statutory question presented in this case, we should only have to look at the economic realities. The Legislature has chosen to create incentives for brownfield restoration and historic preservation. Rather than supporting such efforts directly, the Legislature subsidizes that pursuit through tax policy. Cf. *United States v Hoffman*, 901 F3d 523, 537 (CA 5, 2018) ("Tax credits are the functional equivalent of government spending programs."). The Legislature has imposed specific controls on how the credit is earned and how it can be claimed. As relevant here—and as the parties agree—the Legislature allows only a single assignment to a qualifying partner, member, or shareholder. The parties also agree—and it is abundantly clear—that there was never a prohibited successive assignment between Comerica-Michigan and Comerica-Texas. Instead, Comerica-Texas claims the credit by reason of its merger with Comerica-Michigan.

As our Court of Appeals has recognized, "the effect of a merger or consolidation on the existing constituent corporations depends upon the terms of the statute under which the merger or consolidation is accomplished." *Handley v Wyandotte Chems Corp*, 118 Mich App 423, 425; 325 NW2d 447 (1982). In this case, the merger proceeded under MCL 487.13703, which governs bank mergers. The bank-merger statute provides that Comerica-Texas, as the consolidated bank following the merger, "holds and enjoys the same and all rights of property, franchises, and interests . . . in the same manner and to the same extent as those rights and interests were held or enjoyed by each consolidating organization at the time of the consolidation." MCL 487.13703(2). Comerica-Texas also "is subject to all the restrictions, disabilities, liabilities, and duties of each of the consolidating organizations." MCL 487.13703(1). As a matter of law, Comerica-Texas and Comerica-Michigan are one and the same, because Comerica-Michigan's corporate

3

existence continues in Comerica-Texas even though it is no longer a separate entity. See MCL 487.13703(1).[1]

As a practical matter, not only is there no statutory prohibition on Comerica-Texas claiming the disputed tax credits by the terms of the merger, it would be grossly unjust and contrary to legislative intent to hold otherwise. It would make little sense to find Comerica-Texas subject to Comerica-Michigan's tax liabilities as the result of the merger but not its earned tax credits resulting from Comerica-Michigan's real-life efforts to redevelop brownfields and historic properties. The cascading effect of disallowing these credits would be that future businesses will decide against redeveloping properties that earn the credits, which would damage the Legislature's goal of monetarily incentivizing these private-public redevelopment partnerships. The state must be held to its side of the bargain, and I see no reason to think that there was ever any intention on the part of the state to disallow petitioner from claiming the earned tax credits in this situation.[2]

For these reasons, I concur in part and dissent in part.

Elizabeth M. Welch

---

[1] This is also a general statement of Michigan corporation law. Although the Business Corporation Act, MCL 359.1101 *et seq.*, does not apply to banking corporations, MCL 450.1123(2), it similarly provides that following a merger the surviving corporation receives all rights and title to property "without reversion or impairment," MCL 450.1724(1)(b), as well as "all liabilities," MCL 450.1724(1)(d).

[2] I also question the majority opinion's reference to *TOMRA of North America, Inc v Dep't of Treasury*, 505 Mich 333, 343; 952 NW2d 384 (2020). Discarding 166 years of legal precedent, *TOMRA* held for the first time that "the canon requiring strict construction of tax exemptions . . . is a canon of last resort" and instead chose a malleable standard for statutory interpretation. See *TOMRA*, 505 Mich at 340-343. Regardless of any differences in judicial philosophies about how to go about statutory interpretation, *TOMRA* concerned tax exemptions, i.e., the absence of tax in a given situation. It did not concern tax credits. It has no application here.

4